**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| SCOUT SITTINGER, | ) | CASE NO. 1:22-CV-01927-BYP |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| v. | ) | BENITA Y. PEARSON |
| | ) | |
| | ) | U.S. MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

I.      **INTRODUCTION**

Plaintiff Scout Sittinger ("Ms. Sittinger") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for supplemental security income ("SSI") and childhood disability benefits ("CDB"). (ECF Doc. 1.) U.S. District Judge Benita Y. Pearson has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

II.      **PROCEDURAL HISTORY**

A.  **Prior Application**

On January 17, 2020, Ms. Sittinger previously filed applications for CDB and SSI, alleging a disability onset date of October 1, 2010. (Tr. 35.)[1] On March 13, 2020, the ALJ issued a written decision finding that Ms. Sittinger was not disabled as defined by the Social Security Act. (Tr. 35-

---

[1] The administrative transcript ("Tr.") is located at ECF Doc. 6 on CM/ECF.

47.) The ALJ's decision became final when the Appeals Council declined further review on October 6, 2020. (ECF Doc. 6-1, PageID#1442-49.)

### B.  **Current Application[2]**

On November 10, 2020, Ms. Sittinger filed applications for CDB and SSI, alleging a disability onset date in 1999, on the date of her birth. (Tr. 86.) These applications were denied initially and upon reconsideration. (Tr. 119-22, 124-27, 130-33, 135-36.) Ms. Sittinger requested a hearing before an administrative law judge ("ALJ"). (Tr. 137-40, 160-64.) On December 10, 2021, an ALJ held a telephonic hearing due to the COVID-19 pandemic, during which Ms. Sittinger, represented by counsel, and a vocational expert testified. (Tr. 4-30.) On December 23, 2021, the ALJ issued a written decision finding that Ms. Sittinger was not disabled under the Social Security Act. (Tr. 86-106.) The ALJ's decision became final on October 3, 2022, when the Appeals Council declined further review. (Tr. 112-17.) Ms. Sittinger filed a Complaint on October 27, 2022, challenging the Commissioner's final decision. (ECF Doc. 1.) She raises the following assignments of error:

(1) Whether the Administrative Law Judge erred in finding that the state agency consultants' opinions were persuasive.

(2) Whether the Administrative Law Judge erred by failing to have a medical expert at the hearing to provide testimony regarding the Plaintiff's severe impairment of Klippel-Trenaunay Syndrome, causing the decision to lack substantial evidence.

(3) Whether the Administrative Law Judge erred in the amount of persuasiveness assigned to the opinion of McKenzie Ice, APRN.

(ECF Doc. 9, PageID#1494.)

### III.  **BACKGROUND INFORMATION**

### A.  **Personal, Educational, and Vocational Experience**

---

[2] No request was made to reopen the March 2020 decision.

Ms. Sittinger was born in 1999, and she maintains that her alleged disability onset date is the date of her birth. (Tr. 104.) She lives with her parents. (Tr. 11.) She does not have a driver's license (Tr. 12.) She is a high school graduate. (*Id.*) She attempted community college on a few occasions but did not earn a degree.  (*Id.*) She has no past relevant work. (Tr. 104.)

### B.  Relevant Hearing Testimony

#### 1.  *Ms. Sittinger's Testimony*

Ms. Sittinger testified that she does not have any sources of income. (Tr. 11.) She stated that she is unable to drive due to pain.  (Tr. 12.) Her father usually drives her. (*Id.*) Ms. Sittinger graduated from high school and took community college classes, but she dropped out because she was unable to attend class or focus due to pain. (*Id.*) She indicated that she has not earned any college credits because she has never been able to complete a class. (Tr. 13.)  She has no past relevant work. (*See* Tr. 14, 104.)

Ms. Sittinger testified that she felt that the condition of her leg deteriorated since the prior January 2020 administrative hearing. (Tr. 16-17.) She stated that her leg feels like it is "slowly…breaking from inside and just every second of [her] li[f]e re[v]olves around managing [her] pain." (Tr. 17.) She testified that she had been participating in a pharmaceutical trial involving an ointment/cream, but she was unsure if she would participate in the second part of that trial "because [the ointment/cream] could be a placebo…and [she] need[s] some form of treatment." (*Id.*) She stated that she is unable to work because of her leg. (*See id.*) She testified that her depression "entirely stems from [her] leg disability and [her] pain." (*Id.*)

Ms. Sittinger also discussed the embolization procedures that she underwent. She describes these procedures as "flares." (*See* Tr. 18.) She testified that the embolization procedures involve

needle injections that "sort of kill the vein malformation from the inside because…the vein malformations are all digging into [her] muscles and [her bones]" and have "completely eroded" the cartilage in her leg. (Tr. 18.) She stated that she has been receiving these "flares" since she was about four to five years old, and that she has probably received more than 50. (*Id.*) She stated that the issue with these procedures is that one "can only have so much of that medicine…during [their] lifetime and [she is] approaching the limit." (*Id.*) She testified that the main symptoms these procedures treat are vein malformations and pain stemming from the vein malformations. (*See* Tr. 18-19.) She stated that she recently underwent a procedure in September and October 2021 and that they "help[ed] a little bit," but she stated it was a problem because the injections "have to [be] do[ne] everywhere." (Tr. 19.)

Ms. Sittinger also testified that her venous malformation "changes." (*Id.*) She explained that it "gets bigger" in certain parts of her legs and that it is "constantly changing and growing." (*Id.*) She testified that the pain gets worse when the venous malformation "changes and grows." (Tr. 20.)

Ms. Sittinger also discussed her physical therapy. (*Id.*) She stated that her physical therapist discharged her to a home exercise plan. (*Id.*) She testified that the program typically involves leg strengthening and flexibility exercises twice a day for approximately 45 minutes per day. (*Id.*) When asked whether physical therapy improves her pain, Ms. Sittinger testified that "[i]t honestly depends[.]" (Tr.21.)

Ms. Sittinger described her symptoms of depression as feeling hopeless about the future and fear that she will still be living with her parents in her 30s or 40s because she cannot maintain a job. (*Id.*) She also testified that she has difficulty sleeping at night due to pain in her leg. (*Id.*) She volunteers at an animal shelter and said she is unable to take the dogs for a walk around the

block, and walking across the room is only "metro-manageable" for her. (*Id.*) She stated that she can only walk approximately 20 feet to 30 feet before she needs to rest or sit down. (*See* Tr. 22-23.) She also testified that she cannot sit for more than three minutes before needing to move around. (Tr. 23.)

Ms. Sittinger also reported difficulty concentrating. (Tr. 24.) She stated that it was difficult to sit at a desk for approximately an hour and a half, and that sitting in hard seats hurt her bottom and hips, making it difficult to concentrate and participate. (*Id.*)

## 2. *Vocational Expert's Testimony*

The vocational expert ("VE") opined that Ms. Sittinger had no past relevant work. (Tr. 25.) For his first hypothetical, the ALJ asked whether an individual with Ms. Sittinger's age and education and with no past work experience could perform work at the light exertional level, with the additional limitations of occasionally pushing and pulling with the lower left extremity; occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; occasionally balancing and crawling; frequently stooping, kneeling, and crouching; should avoid concentrated exposure to extreme cold; and can perform at simple/routine tasks with no fast pace or high production quotas and with infrequent changes. (*Id.*) The VE opined that this individual could perform work as a marker, bagger, and cashier. (Tr. 26.) The VE stated that his testimony was consistent with the *Dictionary of Occupational Titles* and supplemented with his experience and training. (*Id.*)

For the next hypothetical, the ALJ asked whether an individual with Ms. Sittinger's age and education and with no past work experience could perform work at the light exertional level, with the additional limitations of occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; occasionally balancing; frequently stooping, kneeling, and crouching;

occasionally crawling; can tolerate frequent exposure to extreme cold; can understand, remember, carry out and complete simple/routine tasks with no fast pace or high production quotas; and can adapt to only occasional workplace changes. (Tr. 26.) The VE opined that this individual could perform the same jobs listed for the first hypothetical. (Tr. 27.)

The ALJ then asked whether an individual with the same limitations from the second hypothetical, except reduced to the sedentary exertional level, could perform work. (*Id.*) The VE opined that this individual could perform work as a final assembler, telephone information clerk, and a food and beverage order clerk. (Tr. 27-28.)

The VE also opined that, based on his experience and training, an employer's tolerance for time off task would be 15% of the workday. (Tr. 28.) The VE also stated that the employer's tolerance for absences from work is one-and-a-half days per month on average. (*Id.*)

Ms. Sittinger's counsel asked whether an individual could perform work if they had an additional limitation that would require a sit/stand/walk option every 15 minutes. (Tr. 29.) Specifically, Ms. Sittinger's counsel clarified that this limitation would include changing position from sitting to standing to walking in 15-minute intervals. (*Id.*) The VE opined that this limitation would be work-preclusive. (*Id.*)

Ms. Sittinger's counsel also asked the VE how an employer treats an individual that required breaks beyond those typically allowed in an employment setting. (*Id.*) The VE responded that the employer treats them "probably differently." (*Id.*) The VE stated that every employer typically has three breaks in a day: two 10 to 15-minute breaks and a 30-minute meal break. (*Id.*) The VE testified that additional breaks would not be viewed favorably and would jeopardize employment. (*Id.*)

### C.  Relevant Medical/Non-Medical Opinion Evidence

1. *State Agency Opinions*

A. **State Agency Physicians**

In January 2021, Dr. Gail Mutchler, M.D., reviewed Ms. Sittinger's medical record at the initial level of consideration. (Tr. 55-59.) Dr. Mutchler observed that the prior ALJ found Ms. Sittinger's Klippel-Trenaunay-Weber Syndrome was severe and limited her to light work. (Tr. 44.) Dr. Mutchler noted that Ms. Sittinger was progressing well in December 2020, had some fatigue, but was able to complete the physical therapy exercises. (Tr. 56.) Dr. Mutchler also observed that Ms. Sittinger's physical therapist noted that Ms. Sittinger was functional and did not look to be "painful" but was stiff through her ankle and knee. (*Id.*) Dr. Mutchler explained that, due to Ms. Sittinger's underlying condition, she had undergone multiple surgical interventions as discussed in the prior ALJ's decision. (Tr. 59.) Dr. Mutchler noted that on October 15, 2020, Ms. Sittinger underwent a prophylactic intramedullary nailing of her left tibia without complication. (*Id.*) But Dr. Mutchler explained that the evidence was considered part of and consistent with the overall clinical situation as described in the previous decision and was not a new or material change. (*Id.*) Accordingly, Dr. Mutchler adopted the RFC of the prior ALJ and found that Ms. Sittinger could perform light work, except that she can occasionally push and pull with her left lower extremity; occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasionally balance and crawl; frequently stoop, kneel, and crouch; and must avoid concentrated exposure to extreme cold. (*See* Tr. 59.)

In June 2021, Dr. Dimitri Teague, M.D., reviewed Ms. Sittinger's medical record at the reconsideration level. (Tr. 69-74.) Dr. Teague reviewed the initial records and records from 2021. (Tr. 70.) Dr. Teague noted that in April 2021, Ms. Sittinger presented with Klippel-Trenaunay-Weber Syndrome and "worsening symptoms and disfigurement of the lateral foot lower extremity

and left pelvis and hip region. PE noted vascular anomaly [in Ms. Sittinger's] lower limb." (*Id.*) Dr. Teague concluded that there had been no new and material changes since the prior ALJ's decision. (Tr. 73.) Accordingly, Dr. Teague affirmed Dr. Mutchler's findings. (*Id.*)

## B.  State Agency Psychologists

In January 2021, Dr. David Dietz, Ph.D., reviewed Ms. Sittinger's mental health records at the initial level of consideration. (Tr. 55-59.) Dr. Dietz considered evidence from the relevant period, noting that in June 2020 Ms. Sittinger reported depression because of pain, and that her mental status exam revealed logical thoughts, normal speech, neutral/depressed mood, intact attention, and fair memory. (Tr. 56-57.) Dr. Dietz also noted that the October 2020 treatment notes indicate that Ms. Sittinger was compliant with medication, denied major issues with depression or anxiety, and hoped to start school. (Tr. 56.) Dr. Dietz noted that the mental status examination demonstrated expressive, logical thoughts, and normal speech. (*Id.*) Dr. Dietz also noted that Ms. Sitinger was alert and oriented times three, had intact attention, neutral/depressed mood, and fair memory. (Tr. 56-57.) Dr. Dietz adopted the mental RFC finding of the prior ALJ limiting Ms. Sittinger to perform simple, routine tasks (unskilled work) with no fast pace or high production quotas and with infrequent change. (Tr. 41, 58.) Dr. Kristen Haskins, Psy.D., reviewed Ms. Sittinger's mental health records in June 2021 and affirmed Dr. Dietz's findings. (Tr. 69-72.)

## 2.  *Mackenzie Ice, MS, APRN, PMHNP-BC*

On November 11, 2021, Nurse Ice, MS, APRN, PMHNP-BC, completed a mental capacity medical source statement. (Tr. 1444-45.) On a check box form, Nurse Ice indicated that Ms. Sittinger had mild to extreme limitations in several areas of functioning. (*Id.*) Nurse Ice opined that Ms. Sittinger had extreme limitations in her ability to work a full day without needing more than the allotted number or length of rest periods during the day. (Tr. 1445.) Nurse Ice noted

marked limitations regarding Ms. Sittinger's ability to ask for help when needed; keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness; work at an appropriate and consistent pace; and sustain an ordinary routine and regular attendance at work. (Tr. 1444-45.) Nurse Ice indicated moderate limitations regarding Ms. Sittinger's ability to describe work activity to someone else; identify and solve problems; sequence multi-step activities; state own point of view; initiate or sustain conversation; respond to requests, suggestions, criticism, correction, and challenges; initiate and perform a task that she understands and knows how to do; complete tasks in a timely manner; ignore or avoid distractions while working; change activities or work settings without being disruptive; work close to or with others without interruption or distracting them; respond to demands; manage one's psychologically based symptoms; make plans for oneself independent of others; and be aware of normal hazards and take appropriate precautions. (*Id.*)

Nurse Ice then opined that Ms. Sittinger had mild limitations regarding her ability to understand and learn terms, instructions, or procedures; follow one or two step oral instructions to carry out a task; recognize a mistake and correct it; use reason and judgment to make work-related decisions; cooperate with others; handle conflict with others; understand and respond to social cures; adapt to changes; distinguish between acceptable and unacceptable work performance; and set realistic goals. (*Id.*) Finally, Nurse Ice opined that Ms. Sittinger had no limitation regarding her ability to ask and answer questions and provide explanations. (Tr. 1444.)

The form warned that "[i]t is imperative that you provide an explanation of the medical and clinical findings that support [her] assessment of limitations – a simple recitation of the diagnosis will not be sufficient to comply with Social Security's regulations." (Tr. 1445) (emphasis

removed). Yet when asked to state the diagnosis and medical and clinical findings that supported her assessment, Nurse Ice merely wrote "F33.1 Major Depressive Disorder." (*Id.*)

### D.  Relevant Medical Evidence

#### 1.  *Physical Impairments*

On June 24, 2020, Dr. Irina Pateva, a hematologist, evaluated Ms. Sittinger for a vascular lesion on her leg. (Tr. 494.) Dr. Pateva discussed Ms. Sittinger's medical history of being born with a large vascular lesion on her left lower extremity that went from the back of her buttocks to her left foot. (*Id.*) Dr. Pateva noted that Ms. Sittinger was diagnosed with Klippel-Trenaunay-Weber syndrome at four years old, and that she has had several surgeries and sclerotherapy treatments. (*Id.*) Ms. Sittinger reported that her lesions were becoming more painful despite medical treatments. (*Id.*) Dr. Pateva's examination revealed increased varicosity, venous malformation and telangiectasia extending over the back of her left buttock down to the left foot; a flat lesion; pain with palpation in the deep gluteal region and left lateral foot plantar surface; and the left upper back thigh appeared more swollen than the right. (Tr. 496.) Dr. Pateva also noted that there was swelling of the left leg which was larger than the right leg at some of the segments, and there was an extensive slow flow malformation and D dimer elevation. (Tr. 499.) Dr. Pateva recommend that Ms. Sittinger begin treatment with Sirolimus. (Tr. 500.)

On July 1, 2020, Ms. Sittinger reported to Dr. Anand Kumar with worsening symptoms and disfigurement of the left lateral foot, lower extremity, and left pelvis/hip region. (Tr. 550.) Dr. Kumar's examination revealed varicosity; venous malformation and telangiectasis; flat lesions; a port wine stain on her left lower extremity; overgrowth of the left later foot and plantar surface; left lateral thigh and cutaneous venous blebs in the gluteal region; and pain with palpation in the gluteal region and left lateral foot plantar surface. (Tr. 551.) However, Dr. Kumar's examination

also revealed no hemangioma, lymphangioma, or arterio-venous malformation, and that the vascular anomaly was not hard, symmetric, raised, ulcerated, or mobile. (*Id.*)

On September 16, 2020, Ms. Sittinger was evaluated by Ann Dorobek, M.D., for purposes of obtaining medical marijuana for chronic pain. (Tr. 1268-1273.) The examination findings revealed that Ms. Sittinger was in no acute distress; with normal skin, hearts, lungs and abdomen; normal extremities without clubbing, cyanosis, or edema; and normal neurological findings, including normal upper and lower extremity strength and intact sensation. (*Id.*) Dr. Dorobek diagnosed Ms. Sittinger with complex regional pain syndrome of the left lower extremity and chronic intractable pain, and she provided Ms. Sittinger with a medical cannabis card. (Tr. 1268.)

On October 6, 2020, Ms. Sittinger was evaluated by Dr. George Ochenjele, M.D., an orthopedic surgeon. (Tr. 642-47.) She reported progressively worsening pain in her left tibia at rest and with weightbearing. (Tr. 643.) Dr. Ochenjele noted that Ms. Sittinger had a history of Klippel-Trenaunay-Weber Syndrome, vascular malformations in the left leg, status post multiple sclerotherapies and knee arthroscopies, as well as open debridement of the knee. (*Id.*) He also noted a tibial shaft lesion recently detected on x-ray, for which Ms. Sittinger had been referred for possible prophylactic fixation. (*Id.*) A physical examination revealed an area of superficial vascular malformation at the left leg, tenderness to palpation over the tibia midshaft, and a mildly antalgic gait on the left with ambulation. (Tr. 644.) However, Dr. Ochenjele also noted that Ms. Sittinger was alert, oriented, and in no acute distress, with an appropriate mood and affect, normal heart, lungs, and abdomen, no open wounds, and normal sensation and motor function of her left leg. (*Id.*) An x-ray showed cortical based midshaft lucency with involvement of about one-third of the shaft of the tibia, and Dr. Ochenjele noted MRI findings of continuation with a vascular malformation and erosion into the tibia. (*Id.*) He diagnosed Ms. Sittinger with impending

pathologic fracture, lytic bone lesions on x-ray, and Klippel-Trenaunay-Weber Syndrome, and he ordered surgery. (Tr. 642.)

On October 9, 2020, Dr. Salim Abboud, M.D., performed a technically successful STS embolization sclerotherapy of left lower leg vascular anomaly involving the posterior tibial cortex. (Tr. 419-20.) He noted that Ms. Sittinger tolerated the procedure well, and she was transferred to recovery in stable condition. (Tr. 420.)

On October 15, 2020, Dr. Ochenjele perform a prophylactic intramedullary nailing of an impending left tibia fracture. (Tr. 640, 847.) Ms. Sittinger was discharged the following day in stable condition and advised to follow up with Ms. Elizabeth Dachenhaus, a certified physician assistant. (Tr. 429, 641.)

On October 26, 2020, Ms. Sittinger saw Ms. Dachenhaus. (Tr. 648-50.) Ms. Dachenhaus reviewed the radiographs and found stable fixation, appropriate alignment, no lucency, no loss of fixation, and congruent joint space. (Tr. 650.)

On October 28, 2020, Ms. Sittinger reported that her pain was better controlled on pain medications, but she was not bearing weight on the left lower extremity and was using a walker/wheelchair for mobility. (Tr. 511.) Dr. Pateva's impression was an extensive veno-lymphatic malformation of her left lower extremity from Klippel-Trenaunay-Weber Syndrome. (Tr. 514.)

From November 2020 through January 2021, Ms. Sittinger underwent physical therapy for arthralgia of her left knee, difficulty walking, muscle tightness, muscle weakness, and left ankle stiffness. (Tr. 738-41, 744-53, 1067-86.) She demonstrated a guarded, slow gait with stiffness through the knee and ankle, but a functional, non-painful gait. (Tr. 738-41, 744-53, 1067-86.) She also demonstrated some fatigue, but she was able to complete exercises. (Tr. 738-41, 744-53, 1067-

12

86.) She stopped using her crutches by December 18, 2020 (Tr. 739) and her cane by December 22, 2020 (Tr. 738). At her last appointment in January 2021, the treatment notes indicated Ms. Sittinger demonstrated improved range of motion, strength, and general function in her left lower extremity. (Tr. 910.) The physical therapist noted that Ms. Sittinger continued to be limited most by the areas where she continues to have active vein malformations that cause pain with pressure, which "will likely be an ongoing issue for her." (*Id.*) However, the physical therapist noted that orthopedically, Ms. Sittinger made "great progress and [would] likely cont[inue] to do well with restoring function with [an] ongoing [home exercise program]." (*Id.*)

On April 7, 2021, Ms. Sittinger presented with Klippel-Trenaunay-Weber Syndrome and "worsening symptoms and disfigurement of [her] left lateral foot lower extremity and left pelvis and hip region." (Tr. 907.) Dr. Kumar stated that Ms. Sittinger was involved in a topical PIK3CA inhibitor trial and had to stop her Sirolimus. (*Id.*) Dr. Kumar noted that he would follow up to see if Ms. Sittinger qualified for Stage 2 of the clinical trial. (*Id.*) Dr. Kumar's examination noted improved discoloration in the topical medication trial region, recurrent plantar forefoot, lateral plantar area and lateral toes. (*Id.*)

That same day, Ms. Sittinger also underwent evaluation with Dr. Sonal Shah, M.D. and reported some improvement with treatment, but persistent left foot pain with ambulation. (Tr. 1309.) The examination revealed abnormal purple coloration of the lower extremity skin, and thin, partially compressive papules and plaques on the left lower extremity, but no overgrowth of the left lower extremity in comparison to the right. (Tr. 1311.)

A pelvic MRI from June 1, 2020, revealed grossly overall similar deep and superficial multifocal involvement of the left hemipelvis and left lower extremity by a known low-flow vascular anomaly, compatible with changes of Klippel-Trenaunay-Weber Syndrome. (Tr. 1335-

13

36.) Some areas demonstrated overall increased degree of involvement, particularly the soleus musculature, and some areas appeared slightly improved including the previously visualized two foci within the plantar foot musculature, as well as the area of osseus involvement involving the posterior tibial shaft. (Tr. 1336.) The MRI also revealed changed status of the post intramedullary rod placement with no evidence of hardware failure. (*Id.*)

On June 8, 2021, Dr. Abboud performed a technically successful ST S foam mediated sclerotherapy embolization of multifocal venous anomaly of the left lower extremity, specifically at the plantar aspect of the left foot and the lateral aspect of the left hip. (Tr. 1349.) After the procedure, Ms. Sittinger was transferred to the recovery area in stable condition. (Tr. 1349, 1351, 1354, 1356, 1359.)

On August 22, 2021, Ms. Sittinger reported to Dr. Pateva, a hematologist and oncologist, that she was doing well on the clinical trial with no symptoms or side effects. (Tr. 1369.) She reported persistent lower leg/foot pain, but improved pain in the treatment area, and improved skin appearance after starting the medication. (*Id.*) Ms. Sittinger expressed interest in participating in the second part of the clinical trial. (*Id.*) Her physical examination revealed vascular malformation from the left buttocks down to the foot, with venous ectasis over the buttocks and lateral leg, and purple discoloration of the left lateral foot surface and left third, fourth, and fifth toes. (Tr 1370.) But the physical examination findings also revealed Ms. Sittinger was in no distress with normal heart, lungs, and abdomen; intact range of motion; no joint swelling; normal strength; otherwise normal extremities, including no cyanosis, edema, contusions, wounds, or clubbing; otherwise normal skin, including no swelling, oozing, or bleeding from the lesion; intact sensation, motor, response, and reflexes; normal strength; and appropriate mood and behavior. (Tr. 1370.) Dr. Pateva noted that a skin biopsy was positive from TEK, a variant mutation which made her eligible to be

14

controlled in the trial. (Tr. 1371.) Ms. Sittinger said she was interested in sclerotherapies while awaiting the second part of the study to open. (*Id.*)

On October 15, 2021, Ms. Sittinger reported increased malformation and left lower extremity pain to Dr. Pateva. (Tr. 1423-27.) She stated that she was unable to work or go to school as a result of the pain. (Tr. 1423.) She admitted improved left foot pain during the clinical trial, and some improvement with use of medical marijuana. (*Id.*) She also reported taking Motrin and Neurontin as scheduled. (*Id.*) Her physical examination was unchanged from August 2021. (Tr. 1424-25.) Dr. Pateva assessed Ms. Sittinger with extensive veno-lymphatic malformation of the left lower extremity (questionable Klippel-Trenaunay Syndrome) and ordered her to resume Sirolimus daily. (Tr. 1427.) Dr. Pateva told Ms. Sittinger that if she continued to have pain, they could try Lovenox therapy,[3] as it had shown some benefit for complex lymphatic malformation patients. (*Id.*)

### 2. *Mental Impairments*

Ms. Sittinger received mental health treatment consisting of medication management, individual counseling, and case management services, from January 2020 through August 2021. (Tr. 353-410, 667, 734, 1283-1302, 1385-1412.)

On February 28, 2020, Ms. Sittinger reported to her mental health counselor that her chronic pain and depression were linked, and that she was concerned about coping with her pain management. (Tr. 407.) She reported increased anxiety due to family stressors (Tr. 713, 715), and irritability due to increased pain (Tr. 715) at appointments on March 26, 2020, and April 23, 2020.

---

[3] Lovenox (a.k.a. enoxaparin) is a blood-thinning drug used to prevent blood clots in the leg veins. *See Lovenox (Enoxaparin) Information*, U.S. Food and Drug Administration, https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/lovenox-enoxaparin-information (last visited Sept. 5, 2023).

On May 18, 2020, Ms. Sittinger reported struggling "a lot" with physical pain and having her surgery delayed due to the COVID-19 pandemic. (Tr. 717.) She shared emotions of anger and resentment towards her conditions and how it affects her mental health. (*Id.*) She responded well to reframing and new skills, as well as a personalized brainstorm. (*Id.*)

On June 1, 2020, Nurse Ice diagnosed Ms. Sittinger with moderate recurrent major depressive disorder with anxious distress. (Tr. 369.) Ms. Sittinger reported worsening depression over the past month due to pain from her last operation, and her sleep and appetite was affected by her pain level. (*Id.*) The mental status exam revealed Ms. Sittinger had neutral/depressed mood, logical thought process, clear speech, expressive language, fair fund of knowledge, fair insight/judgment, and fair memory; was alert and oriented "x3"; and had no abnormal thought content. (Tr. 369-70).

On June 9, 2020, Ms. Sittinger reported to Ms. Cieslak, ATBR-BC, LPCC-S that she had ongoing physical pain that contributed to her depressive emotions. (Tr. 719.) She reported continuing to cope by reading, creating art, and interacting with family and pets. (*Id.*) She responded well to personalized reflection, as well as reframing and observing rather than judging. (*Id.*) At telehealth appointment on June 20, 2020, Ms. Sittinger reported to Ms. Cieslak that she felt frustrated and limited after her last doctor's appointment. (Tr. 723.) She shared that she wanted to get rid of her pain and anger but knew "this is not realistic." (*Id.*) Ms. Cieslak indicated that Ms. Sittinger responded well to CBT reframing and validation. (*Id.*) Ms. Sittinger reported progress towards recognizing emotions are all valid and "pushing against them may not be helpful." (*Id.*)

Ms. Sittinger had counseling sessions with Ms. Kathryn Hazen, BS, QMHS from July 20, 2020 through December 21, 2020. At Ms. Sittiner's July 2020 appointment, she reported no changes in her anxiety and depression, but stated that she had become more agitated. (Tr. 383.)

16

The counseling notes revealed euthymic mood, pleasant behavior/functioning, logical thought process, and being oriented times three. (Tr. 383.) At her August 2020 appointment, Ms. Sittinger reported that she had been more irritable lately, and that she had been distancing herself from her family to keep herself from "lashing out." (Tr. 385.) She also reported pain related to her condition, no changes in her status, and that she had been feeling down. (*See id.*) The counseling notes indicated euthymic mood/affect, pleasant behavior/functioning, logical thought process, and being oriented times three. (*Id.*) At her December 2020 appointment, Ms. Sittinger reported recovery from her surgery was "still going okay" and pain from her condition but stated "it[']s the usual." (Tr. 393.) She reported no changes in her status and that she was compliant with medications. (*Id.*) The counseling notes revealed pleasant behavior/functioning, logical thought process, and being oriented times three. (*Id.*)

On February 8, 2021, Ms. Sittinger told Nurse Ice that she still had bad days, but she was able to cope well. (Tr. 1287.) She reported that her sleep was stable except when pain was worse. (*Id.*) She reported that she had stable appetite and reduced pain because her leg healed completely after the last surgery. (*Id.*) She reported compliance with her medications and no side effects. (*Id.*) She also denied any major issues with depression and anxiety. (*Id.*) The mental status examination findings revealed she had expressive language, logical thought process, clear speech, no abnormal thought content, intact associations, euthymic/neutral mood, fair memory, fair insight/judgment, fair knowledge; was alert; and was oriented times three. (Tr. 1287-88.) An Individual Service Plan from March 2021 indicated that Ms. Sittinger reported that her symptoms of depression were linked with chronic pain, insomnia, loss of interest in activities, isolation, depressed mood, and lack of motivation. (Tr. 1283.)

On May 3, 2021, Ms. Sittinger told Nurse Ice that she experienced improvement in her mood with the clinical trial medication, some relief of sclera pain, and stable appetite and sleep. (Tr. 1290.) She denied any major issues with depression and anxiety. (*Id.*) The mental status exam findings revealed Ms. Sittinger had logical thought processes, expressive language, clear speech, no abnormal thoughts, alert attention/concentration, intact associations, fair memory, fair insight/judgment, fair fund of knowledge, and neutral/"ok" mood. (Tr. 1290-91.)

On August 2, 2021, Ms. Sittinger presented for a follow up appointment with Nurse Ice regarding her medication. (Tr. 1403.) Ms. Sittinger reported that her mood had been "ok, or the best it's going to be despite my situation." (*Id.*) She denied any major issues with anxiety and had no new health issues to report. (*Id.*) She indicated that she would like to possibly return to college but was unsure. (*Id.*) She reported that she was not working due to physical pain. (*Id.*) The mental status examination revealed Ms. Sittinger had blunted/flat affect, was oriented, and had intact associations, normal orientation, and fair insight/judgment. (Tr. 1407-08.)

## IV.     THE ALJ'S DECISION

In his December 2021 decision, the ALJ first found that Ms. Sittinger had not reached the age of 22 years old in 1999, the alleged disability onset date. (Tr. 89.) The ALJ then found Ms. Sittinger had not engaged in substantial gainful activity since the alleged disability onset date, which was also the date of her birth. (*Id.*) The ALJ further determined that Ms. Sittinger has the following severe impairments: Klippel-Trenaunay-Weber Syndrome;[4] left Achilles shortening;

---

[4] Klippel-Trenaunay-Weber Syndrome is a congenital disorder that is "a combination of angiomatosis (usually nevus flameus and nevus avanus) and associated with enlargement and venous anomalies of an affected limb." *Klippel-Trenaunay-Weber Syndrome*, Stedman's Medical Dictionary 884360 (Nov. 2014). This disorder typically has the following characteristic features: (1) a red birthmark called a "port-wine stain"; (2) atypical vein or lymphatic development (malformations); (3) and overgrowth of soft tissues and bones usually in one leg but sometimes in the arms or (rarely) on the torso. *See Klippel-Trenaunay Syndrome*, National Institute of Neurological Disorders and Stroke, https://www.ninds.nih.gov/health-information/disorders/klippel-trenaunay-syndrome (last visited Sept. 5, 2023).

complex regional pain syndrome of the left knee; patella arthralgia of the left knee/chondromalacia of the left patella; neuropathy of the left peroneal nerve; and major depressive disorder with anxious distress. (*Id.*) However, the ALJ found that none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ also determined that Ms. Sittinger has the residual functional capacity to occasionally lift and carry 20 pounds and frequently and carry 10 pounds; is able to stand and walk 6 hours of an 8-hour workday; is able to sit for six hours of an eight-hour workday; to occasionally push and pull with the lower left extremity; to occasionally climb ramps and stairs; to never climb ladders, ropes, and scaffolds; to occasionally balance and crawl; to frequently stoop, kneel, and crouch; to avoid concentrated exposure to extreme cold; and can perform simple routine tasks (unskilled work) with no fast pace or high production quotas and with infrequent change. (Tr. 92.) Because Ms. Sittinger received a final decision on a prior disability claim, the ALJ considered whether there was new and material evidence that resulted in a change to Ms. Sittinger's condition.[5] (Tr. 101.) The ALJ concluded that, despite the updated medical records, there was insufficient evidence to justify departing from the residual functional capacity from the previously adjudicated time period.[6] (Tr. 102.) Accordingly, the ALJ concluded that Ms. Sittinger would retain the same RFC as the prior finding. (*See* Tr. 92.)

---

[5] In *Drummond v. Commissioner of Social Security*, the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances" 126 F.3d at 842. In response to *Drummond*, the agency issued Acquiescence Ruling 98-4(6), which incorporates the *Drummond* holding. Acquiescence Ruling 98-4(6) explains that, under *Drummond*, "[w]hen adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the [Social Security] Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings . . . ." *Id.*

[6] In *Earley v. Commissioner of Social Security*, the Sixth Circuit clarified its prior decision in *Drummond*. 893 F.3d 929 (6th Cir. 2018). The court clarified that *res judicata* does not apply when a claimant files a subsequent

The ALJ next determined that Ms. Sittinger has no past relevant work. (Tr. 104.) The ALJ then determined that transferability of job skills was not an issue because Ms. Sittinger does not have past relevant work. (*Id.*) Considering Ms. Sittinger's age, education, work experience, and RFC, the ALJ found that there are jobs that exist in significant numbers in the national economy that Ms. Sittinger could perform, including employment as a marker, bagger, and cashier. (Tr. 104-05.) Accordingly, the ALJ concluded that Ms. Sittinger was not disabled as defined in the Social Security from the alleged disability onset date through the date of the ALJ's decision. (Tr. 105.)

## V.      LAW & ANALYSIS

### A.   <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the

---

application for benefits for a different period. *Earley*, 893 F.3d 934. The court explained that ALJs are permitted to review prior ALJ findings but are not bound by them. *Id.* at 934. It appears that Ms. Sittinger does not dispute that the ALJ considered the prior ALJ's findings and compared it with the later submitted evidence. Rather, Ms. Sittinger disputes whether the RFC finding is supported by substantial evidence. Accordingly, I find that the ALJ satisfied the "fresh review" that *Earley* requires. *Id.*

Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B. <u>Standard for Disability</u>

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the

national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id*.

### C.  Evaluation of Medical Opinions (Step Four)

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how she considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2).4 According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520(c)(1)-(2).

### D.  The ALJ Did Not Err in Finding the State Agency Opinions Persuasive.

Ms. Sittinger asserts that the ALJ erred in finding the state agency opinions persuasive. She raises two arguments: (1) the state agency determination ignored changes in her medical health and treatment premised on new and material evidence that demonstrated a worsening of her

medical condition; and (2) the state agency physicians did not have adequate qualifications to assess her functioning. (*See* ECF Doc. 9, PageID#1509-11.) The Commissioner disagrees. (*See* ECF Doc. 11, PageID#1529-34.). For the following reasons, Ms. Sittinger's arguments are not well-taken.

### 1. *The State Agency Physicians Were Qualified Experts that Could Assess Ms. Sittinger's Functioning.*

Ms. Sittinger contends that the ALJ erred by relying on the state agency physicians' opinions because they were "not particularly qualified" to offer an opinion on her functioning. (ECF Doc. 9, PageID#1511). She argues that the ALJ should have obtained an opinion from a vascular specialist, dermatologist, or orthopedic specialist because of the "unusual" nature of Klippel-Trenaunay Syndrome. (*Id.*). This argument is unpersuasive.

First, the Social Security regulations state that reviewing physicians "are ***highly qualified*** and ***experts*** in Social Security disability evaluation." 20 C.F.R. § 404.1513a(b)(1) (emphasis added). While an ALJ is not bound by the state agency findings, the ALJ must consider their findings when assessing a claimant's RFC. *See id.* Thus, Ms. Sittinger does not demonstrate—or offer case law in support of her contention—that Drs. Mutchler and Teague lacked the qualifications to evaluate the medical evidence and offer an opinion regarding Ms. Sittinger's functioning. *See Meyer v. Comm'r of Soc. Sec.*, No. 3:20-cv-01763-JJH, 2021 WL 7449308, at *9 (N.D. Ohio Nov. 29, 2021), *report and recommendation adopted*, 2022 WL 743560 (N.D. Ohio Mar. 11, 2022) ("'Because state agency physicians are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation,' 20 C.F.R. §§ 404.1513a(b)(1), 'an ALJ may rely on their opinions as substantial evidence.'") (further citation omitted); *Brock v. Astrue*, No. 08-231-ART, 2009 WL 1067313, at *6 (E.D. Ky. Apr. 17, 2009)

("[T]he argument that the findings of the two non-examining state agency physicians cannot constitute substantial evidence is inconsistent with the regulatory framework.").

Next, the state agency physicians reviewed Ms. Sittinger's medical records and explained why they determined that she was not disabled. For example, Dr. Mutchler reviewed the record on January 19, 2021, at the initial level of consideration. (Tr. 55-59.) Dr. Mutchler observed that the ALJ from a previous application found Ms. Sittinger's Klippel-Trenaunay-Weber Syndrome to be severe and limited her to light work. (Tr. 55.) The state agency physician then reviewed the medical record from the relevant period and noted that in December 2020, Ms. Sittinger was progressing well, had some fatigue, but was able to complete her physical therapy exercises. (Tr. 56.). Dr. Mutchler also noted that Ms. Sittinger's physical therapist indicated that she was functional and did not look "painful," but had stiffness through the ankle and knee. (*Id.*) Dr. Mutchler also observed that Ms. Sittinger "underwent a prophylactic intramedullary nailing of [the] [left] tibia (without complication)." (Tr. 59.) Dr. Mutchler concluded that this procedure would be considered part of and consistent with the overall clinical situation described in the previous ALJ's decision and not a new/material change. (*Id.*) Thus, Dr. Mutchler adopted the prior RFC findings and determined that Ms. Sittinger could perform a limited range of light work. (*Id.*)

Dr. Teague reached a similar conclusion when she reviewed the medical record at the reconsideration level on June 23, 2021. (Tr. 69-74.) In reviewing the evidence from the relevant period (including additional submitted evidence), Dr. Teague observed that in April 2021, Ms. Sittinger "present[ed] with [K]lippel [T]renaunay [S]yndrome and worsening symptoms and disfigurement of the lateral foot lower extremity and left pelvis and hip region. PE noted vascular anomaly lower limb." (Tr. 70.) However, Dr. Teague determined that there was no new and material evidence that warranted a change in Ms. Sittinger's condition. (Tr. 73.) Thus, Dr. Teague

24

agreed with Dr. Mutchler's findings. (*Id.*) Accordingly, both state agency physicians determined, after review of the medical record, that Ms. Sittinger could perform light work and cited evidence in support of this determination. (Tr. 55-59, 69-74.)

Finally, Ms. Sittinger does not point to any medical opinions from her medical sources indicating that she had functional limitations stemming from Klippel-Trenaunay-Weber Syndrome. Indeed, Ms. Sittinger received treatment from several providers, some of whom had specialties that she argues the state agency physicians lacked (*i.e.*, orthopedics). For example, she received treatment from Dr. Ochenjele, an orthopedic surgeon; Dr. Pateva, a hematologist and oncologist; Ms. Dachenhaus, a certified physician assistant that worked in orthopedics; and Dr. Abboud, a radiologist. (Tr. 537, 642, 648.) But none of those providers offered opinions that Ms. Sittinger had functional limitations. *See Parrish v. Berryhill*, No. 1:16-cv-1880, 2017 WL 2728394, at *8 (N.D. Ohio June 8, 2017) ("Plaintiff's brief also does not identify a single opinion from a treating, acceptable medical source concerning Plaintiff's functional limitations that is inconsistent with the RFC or the State agency opinions."); *Turkovich v. Comm'r of Soc. Sec.*, No. 1:12 CV 01633, 2014 WL 29039, at *8 (N.D. Ohio Jan. 2, 2014) ("While Plaintiff suggests the need for additional workday breaks, she points to no medical source, including Ms. Ball prescribing this requirement or any other limitations not already included in the hypothetical."). Thus, Ms. Sittinger cannot establish that the ALJ improperly relied on the state agency findings.

## 2.  *The ALJ's RFC Finding is Supported by Substantial Evidence.*

The essence of Ms. Sittinger's argument is that the ALJ's RFC finding (and the state agency opinions) that she could perform a reduced range of light work was not supported by substantial evidence. Specifically, she argues that the medical evidence documents a worsening of Klippel-Trenaunay Syndrome and pain as a result. (*See* ECF Doc. 9, PageID#1509.) She contends that

there is an objective basis for her pain worsening because she underwent new treatments; her pelvis MRI demonstrates findings compatible with changes of Klippel-Trenaunay-Weber-Syndrome; and she underwent surgery because her disease was "causing more issues as it progressed." (*Id.* at PageID#1511 (referring to Tr. 12, 377, 381, 395, 417, 419-20, 422, 494, 501, 506, 509, 535, 537, 640, 745, 910, 1295, 1335-36, 1342, 1369-70, 1423, 1426)). Given these findings, she asserts that it was improper for the ALJ to find the state agency opinions persuasive. (*See id.*)

The ALJ considered the medical and non-medical evidence and reasonably concluded that Ms. Sittinger retained the ability to perform a reduced range of light work. In doing so, the ALJ discussed Ms. Sittinger's allegations and noted that, as a result of her conditions, she alleged difficulty with lifting, squatting, bending, standing, walking, sitting, kneeling, stair climbing, concentration, understanding, following instructions, completing activities, getting along with others, and tolerating stress. (Tr. 93; *see* Tr. 250.) The ALJ also observed that Ms. Sittinger testified that she had increased leg pain since the prior administrative hearing, and that her life revolves around the pain. (Tr. 92; *see* Tr. 17.) The ALJ also indicated that Ms. Sittinger testified that her venous malformation was constantly changing and is damaging her leg internally. (Tr. 93; *see* Tr. 18-19.) The ALJ then discussed Ms. Sittinger's treatment history. Specifically, he noted that Ms. Sittinger's reported treatment consisted of needle embolization procedures, participation in a clinical trial, physical therapy, and daily exercises. (Tr. 93; *see* Tr. 419-20, 738-41, 744-53, 1067-86, 1340-59, 1369.)

The ALJ also assessed the medical opinions in the record regarding Ms. Sittinger's functioning. As discussed above, these state agency physicians reviewed evidence from the relevant period and explained why no departure was warranted from the prior ALJ's RFC. The ALJ determined that these opinions were persuasive because they were consistent with the

26

"remaining evidence of record, which confirms persistent left lower extremity vascular malformation/anomaly, with tenderness, occasional overgrowth, skin discoloration, and skin abnormalities, but otherwise normal extremities, without edema, otherwise normal skin, intact range of motion, no joint swelling, normal strength, intact sensation and reflexes, and no noted gait abnormalities on subsequent examinations." (Tr. 102; *see, e.g.*, Tr. 1370, 1424-25.) An RFC determination that is supported by the medical opinions of state agency physicians is generally supported by substantial evidence. *Dodson v. Kijakazi*, No. 5:20-cv-2632, 2022 WL 1090535, at *8 (N.D. Ohio Jan. 20, 2022), *report and recommendation adopted*, 2022 WL 950447 (N.D. Ohio Mar. 30, 2022). Although Ms. Sittinger disagrees with the state agency physicians' qualifications and ultimate conclusions, she fails to point to any other medical opinions indicating a greater limit on her physical functioning. Because Ms. Sittinger establishes no error in the ALJ's reliance on the state agency opinions, the state agency opinions constituted substantial evidence that the ALJ could rely on when crafting the RFC finding. *See Meyer*, 2021 WL 7449308, at *9.

The essence of Ms. Sittinger's claim is that the ALJ (and the state agency physicians) should have found a worsening in Ms. Sittinger's condition. She points to a June 2021 pelvis MRI demonstrating findings compatible with changes of Klippel-Trenaunay-Weber-Syndrome and treatment records showing that she underwent embolization procedures. But the ALJ did in fact consider these treatment records. Specifically, the ALJ observed that Ms. Sittinger had an MRI in June 2021, which revealed findings compatible with changes of Klippel-Trenaunay-Weber Syndrome. (Tr. 97; *see* Tr. 1335-36.) The ALJ then discussed that Dr. Abboud performed a technically successful embolization of Ms. Sittinger's multifocal venous anomaly. (Tr. 98, *see* Tr. 419-20.)

The ALJ even discussed treatment notes subsequent to the procedure with Dr. Abboud. Notably, the ALJ observed that Ms. Sittinger told Dr. Pateva in August 2021 that she was doing well on the clinical trial and had no new symptoms or side effects. (Tr. 98; *see* Tr. 1369.) The ALJ also noted that Ms. Sittinger reported persistent leg/foot pain in August 2021, but improved pain in the treatment area, and improved skin appearance after starting medication. (Tr. 98; *see* Tr. 1370.) The ALJ further noted that the examination findings at the August 2021 visit revealed that Ms. Sittinger had vascular malformation from the left buttocks down to the foot, but also observed that Ms. Sittinger had otherwise normal findings. (Tr. 98; *see* Tr. 1370.)

The ALJ also discussed an October 2021 examination and noted that Ms. Sittinger reported increased malformation and left lower extremity pain to Dr. Pateva. (Tr. 98; *see* Tr. 1423-27.) The ALJ then discussed Dr. Pateva's examination findings, noting vascular malformation of the left lower extremity from the buttocks down to the foot, with venous ectasis over the buttocks and lateral leg but normal cardiovascular, musculoskeletal, and neurological findings. (Tr. 98; *see* Tr. 1424-25.) The ALJ noted that Dr. Pateva assessed Ms. Sittinger with extensive veno-lymphatic malformation of the left lower extremity (questionable Klippel-Trenaunay-Weber Syndrome) and ordered her to resume the medication. (Tr. 98; *see* Tr. 1427.) After careful review of all the evidence from the relevant period, the ALJ reasonably concluded that – despite these new records – Ms. Sittinger's record was absent of new and material evidence that would justify departing from the previous RFC. (Tr. 102.) Specifically, the ALJ noted that Ms. Sittinger's functioning remained relatively unchanged since the prior decision because the examinations confirmed persistent lower extremity vascular malfunction/anomaly, with pain, tenderness, overgrowth, and skin abnormalities/discoloration, but intact range of motion, full strength, and intact reflexes and sensation. (Tr. 102; *see, e.g.*, Tr. 427, 578, 644, 1268-73, 1309, 1311, 1370, 1424-25.)

Ms. Sittinger does not dispute the accuracy of these findings but instead appears to ask to the Court to reweigh the evidence in her favor. But, as demonstrated above, the ALJ articulated valid reasoning and provided substantial evidence in support of his RFC determination. "Even if the evidence could also support another conclusion," the ALJ's decision must stand if, as here, "the evidence could reasonably support the conclusion reached." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999); *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020). Accordingly, Ms. Sittinger does not establish a basis for remand on the account of the ALJ's weighing of the opinion evidence or RFC determination.

### E.   The ALJ Was Not Required to Obtain Medical Expert Testimony.

Ms. Sittinger argues that the Klippel-Trenaunay-Weber syndrome is a "complex congenital disorder whose main issues include capillary malformation, venous malformation [,] and limb overgrowth." (ECF Doc. 9, PageID#1512 (citing Tr. 499)). She states that one of the complications that arise from this condition is pain. (*Id.* (citing Tr. 499)). The ALJ found that – even though Ms. Sittinger underwent Sirolimus therapy, sclerotherapy/embolization procedures, and participation in recent clinical trial – this did not constitute new and material changes because the evidence showed her function remained relatively unchanged since the prior decision, *i.e.*, there were normal exam findings in her lower extremities such as intact range of motion, full strength, and intact reflexes and sensation. (Tr. 102.)

Ms. Sittinger contends that this "evidence and finding lacks the necessary logical bridge between the evidence and the legal determination." (*Id.*) She asserts the factors the ALJ referenced were not key factors associated, and that swelling, increased varicosity, overgrowth, pain with palpation and venous malformation "appear to be more consistent with Klippel-Trenaunay syndrome." (*Id.*) And she further contends that medical expert testimony "would have been most helpful in this area." (*Id.*) She asserts that an expert specializing in vascular medicine would have

29

been "far more appropriate for evaluating Klippel-Trenaunay syndrome and the appropriate factors and evidence associated with this medical condition." (*Id.* at PageID#1513.) Thus, she argues that the ALJ should have had a medical expert present at the hearing to provide testimony regarding this "rare disease," particularly the nature of the disease, the reasonableness of the symptoms, and what limitations would be reasonable. (*Id.*)

An ALJ "has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001). Significantly, "the regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986). Indeed, a full inquiry "does not require a consultative examination at government expense unless the record establishes that such an examination is *necessary* to enable to administrative law judge to make the disability decision." *Id.* (quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977) (emphasis in original)).

Here, Ms. Sittinger does not establish how the existing medical sources did not contain sufficient evidence for the ALJ to make a determination, or how the record was so complicated that the ALJ required a medical expert to make sense of the evidence. As discussed above, Ms. Sittinger saw multiple specialist providers during the relevant period. (*See generally* Tr. 93-100.) Significantly, she does not identify any opinions from these specialist providers assessing any functional limitations for her condition. *See Audino v. Comm'r of Soc. Sec.*, No. 4:17CV1594, 2018 WL 3520836, at *8 (N.D. Ohio July 5, 2018), *report and recommendation adopted sub nom. Audino v. Berryhill*, 2018 WL 3496084 (N.D. Ohio July 20, 2018) (rejecting claimant's argument that the ALJ should have obtained medical expert testimony, in part, because the claimant "d[id]

30

not cite to any pertinent limitations opined by any medical source and not addressed by the ALJ"). Moreover, the ALJ amply and carefully discussed the records related to Ms. Sittinger's condition throughout the relevant period. (*See generally* Tr. 94-100); *see Williams v. Callahan*, No. 97-301, 1998 WL 344073, at *4 n.3 (6th Cir. 1998) (noting that, because the record contained the claimant's extensive medical history, the ALJ did not err in not seeking expert medical testimony). This discussion of the evidence even included the factors that Ms. Sittinger alleges the ALJ should have considered, *i.e.*, swelling, overgrowth, varicosity, and pain upon palpation. (Tr. 93-100.)

Given the abundance of specialist medical records and the lack of medical opinions assessing more restrictive limitations, I cannot find that the ALJ abused his discretion by not calling a medical expert at the administrative hearing. *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 726 (6th Cir. 2013) ("[T]he ALJ was not required to obtain a medical expert to interpret the medical evidence related to Rudd's impairments. In fact, the regulations require the ALJ to evaluate the medical evidence to determine whether a claimant is disabled."); *Gomori v. Kijakazi*, No. 4:21-cv-00401, 2022 WL 3584267, at *2 (N.D. Ohio Aug. 22, 2022). The ALJ had before him a full and complete medical record, which contained sufficient evidence for the ALJ to decide Ms. Sittinger's disability claim absent medical expert testimony. *Snyder v. Comm'r of Soc. Sec.*, No. 5:13cv2360, 2014 WL 6687227, at *11 (N.D. Ohio Nov. 26, 2014) (When "the record contains sufficient evidence for the ALJ to decide a disability claim absent expert medical testimony, failure to call a medical expert will not support remand."); *Nussbaum v. Comm'r of Soc. Sec.*, No. 5:22-CV-01763-SL, 2023 WL 5353142, at *11 (N.D. Ohio Aug. 1, 2023), *report and recommendation adopted*, 2023 WL 5352398 (N.D. Ohio Aug. 21, 2023) (rejecting claimant's argument that the "esoteric nature" of his condition merited expert testimony because the claimant failed to establish

how the existing medical sources did not contain sufficient evidence for the ALJ to make a determination).

Further, based on the record presented, Ms. Sittinger does not demonstrate that the record was so complex, conflicting, or confusing such that the ALJ could not make a determination. *Seabolt v. Colvin*, No. 5:13-CV-02516, 2014 WL 4093073, at \*11 (N.D. Ohio July 17, 2014), *report and recommendation adopted as modified sub nom. Seabolt v. Comm'r of Soc. Sec. Admin.*, 2014 WL 4093026 (N.D. Ohio Aug. 19, 2014) ("[T]his case is not so complex that there were questions of medical fact or situations which required the input of a medical expert."). Accordingly, I recommend that the Court reject this assignment of error because it lacks merit.

**F.** **The ALJ Appropriately Evaluated Nurse Ice's Opinions Regarding Ms. Sittinger's Mental Health Conditions.**

Ms. Sittinger argues that the ALJ erred in evaluating the persuasiveness of Nurse Ice's opinion. (*See* ECF Doc. 9, PageID#1513-15.) Specifically, Ms. Sittinger argues that Nurse Ice's opinion was consistent with and supported by Nurse Ice's notes and the records from other medical providers. She states that Nurse Ice's diagnosis was moderate major depressive disorder recurrent with anxious distress, and that Ms. Sittinger's symptoms reflected those diagnoses. (*See id.* at PageID#1513-14.) Next, she argues that the medical records show a "direct connection" between her pain and depression. (*See id.* at PageID#1514 (citing Tr. 318, 385, 395, 407, 715, 719, 1283, 1295)). Thus, Ms. Sittinger asserts that Nurse Ice's opinion was well supported by the record and consistent with the other mental health providers. (*Id.*) Finally, she contends that the state agency opinions (the only other opinions regarding Ms. Sittinger's mental health limitations) were from "the state agency reviewing physicians who adopted the prior ALJ's limitations." (*Id.* (citing Tr. 59, 73)). Accordingly, she argues that Nurse Ice had "a consistent and lengthy history [with] Ms.

Sittinger and [was] in the best position to offer an opinion as to Ms. Sittinger's limitations." (*Id.*) For the following reasons, I find that Ms. Sittinger's argument lacks merit.

Here, the ALJ concluded that Nurse Ice's opinion was not supported by the record. (Tr. 103.) Nurse Ice completed a Medical Source Statement that was provided in checkbox form. (Tr. 1444-45.) On this checkbox form, Nurse Ice checked a series of boxes rating the severity of Ms. Sittinger's impairments in abilities for specific areas of mental functioning. (*See id.*).[7] The form contained a warning that: "It is imperative that you provide an explanation of the medical and clinical findings that support your assessment of limitations – a simple recitation of the diagnosis will not be sufficient to comply with Social Security's regulations." (Tr. 1445 (emphasis removed)). Below this statement, Nurse Ice was then instructed to "[s]tate the diagnosis and medical and clinical findings that support[ed] [her] assessment[.]" (*Id.*) Nurse Ice, however, merely wrote "F33.1 Major Depressive Disorder." (*Id.*)

The ALJ's discussion is supported by substantial evidence. The Social Security Regulations define supportability as "[t]he more relevant the objective medical evidence and supporting explanations ***presented by*** a medical source are to support his or her medical opinions…the more persuasive the medical opinions will be." 20 C.F.R. § 404.1520c(c)(1) (emphasis added). The ALJ determined that this opinion was "inadequately supported, as it notes a diagnosis of major depressive disorder, but…entirely absent [from the opinion is] any discussion of objective clinical findings on examination to support the significant limitations contained therein." (Tr. 103.) Indeed, as the ALJ concluded, the only explanation presented by Nurse Ice for the assessed limitations was Ms. Sittinger's diagnosis of major depressive disorder. (Tr. 1444-45.)

---

[7] A complete summary of the opined limitations is located at the "Non-Medical/Medical Opinions" section of this Report and Recommendation.

First, although Nurse Ice listed a diagnosis as an explanation, it is well-established that a mere diagnosis says nothing about the severity of a condition. *See Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("The mere existence of…impairments…does not establish that [the claimant] was significantly limited from performing basic work activities for a continuous period of time."); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("[M]ere diagnosis of [a condition]…says nothing about the severity of the condition."). Next, as the ALJ concluded, "entirely absent [from her opinion is] any discussion of objective clinical findings on examination to support the significant limitations [assessed]." (Tr. 103.) Indeed, Nurse Ice merely wrote a diagnosis and did not reference any specific treatment notes or objective medical findings in support of her assessment. (Tr. 1445.) While Ms. Sittinger points to counseling notes in support, Nurse Ice failed to do so. *See Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 176 (6th Cir. 2009) ("Because [the medical source] failed to identify objective medical findings to support his opinion regarding [the claimant's] impairments, the ALJ did not err in discounting his opinion.") (citations omitted); *Goode v. Soc. Sec. Admin.*, No. 1:20-CV-02240-JDG, 2021 WL 5919939, at *17 (N.D. Ohio Dec. 15, 2021) ("While Goode points to the MRI and EMG evidence in support, Dr. Raju did not do so.") (further citations omitted).

The ALJ also discussed how Nurse Ice's opinion was inconsistent with the record evidence. Consistency is defined as "[t]he more consistent a medical opinion[]…is with the evidence from other medical sources and nonmedical sources in the claim…the more persuasive the medical opinion(s) or prior administrative finding(s) will be." 20 C.F.R. § 404.1520c(2). In the instant case, the ALJ stated the following regarding the consistency of Nurse Ice's opinion:

> Furthermore, the opinion is inconsistent with the remaining evidence of record, including the findings of a depressed, anxious, neutral mood, blunted/flat affect, only fair memory, fund of knowledge, insight, and judgment, and occasionally short demeanor when in physical pain, but normal alertness and orientation, generally

pleasant, cooperative, receptive, engaged behavior, well groomed, appropriate appearance, normal speech, language, and thoughts, intact associations and attention/concentration, and no suicidal or homicidal ideation on examinations (Exhibit B3F, B11F, B15F, B20F).

(Tr. 103).

The ALJ's conclusion was supported by substantial evidence. The treatment records do reflect that Ms. Sittinger demonstrated a depressed, anxious, and neutral mood; blunted/flat affect; only fair memory, fund of knowledge, insight, and judgment; and occasionally short demeanor in physical pain. (Tr. 103; *see* Tr. 370, 373, 395, 397, 399, 401, 405, 407, 409, 670, 673, 681, 684, 717, 719, 723, 725, 733, 1283, 1291, 1406.) But the ALJ appropriately reasoned that Ms. Sittinger's treatment records also generally reflected that she had normal alertness and orientation; had generally pleasant, cooperative, receptive, and engaged behavior; was well-groomed; had appropriate appearance, normal speech, language, and thoughts; had intact associations and attention/concentration; and had no suicidal or homicidal ideation on examinations. (Tr. 103; *see* Tr. 366-67, 369-70, 372-73, 375, 377 379, 381, 383, 385, 387, 389, 391, 393, 680-81, 683-84, 686-87, 689, 691, 693, 695, 697, 699, 701, 703, 705, 1287-88, 1290-91, 1293, 1295, 1297, 1299, 1386-87, 1389, 1391, 1393, 1395, 1399, 1406-07.) Such findings appear to contradict some of the extreme limitations that Nurse Ice assessed.

To be sure, Ms. Sittinger does highlight evidence to support her preferred conclusion regarding the persuasiveness of Nurse Ice's opinion, but it is not the Court's role at this stage of review to reweigh the evidence. *See O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x at 416 (A reviewing court may not "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility.") (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)). The ALJ presented valid reasoning and substantial evidence supporting his evaluation of Nurse Ice's opinion. (Tr. 103). Even if there is substantial evidence supporting an opposite conclusion, an

ALJ's findings must be affirmed so long as they are supported by substantial evidence. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Because the ALJ articulated accurate and valid reasons supported by substantial evidence, the ALJ provided an accurate and logical bridge for his finding that Nurse Ice's opinion was unpersuasive.

Finally, Ms. Sittinger appears to argue that the ALJ should have given more weight to Nurse Ice's opinion because Ms. Sittinger had "a consistent and lengthy history [with] Ms. Sittinger." (ECF Doc. 9, PageID#1514.) This argument lacks merit. Because the Social Security regulations consider supportability and consistency the "most important factors," ALJs are obligated to "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions." 20 C.F.R. § 404.1520c(b)(2). However, ALJs "*may, but are not required to,* explain how [they] considered" the remaining factors such as the length and frequency of treatment. *Id.* (referring to factors listed in 20 C.F.R. § 494,1529c(c)(3)-(5)) (emphasis added); *see Karniotis v. Comm'r of Soc. Sec.*, No. 3:20-CV-02416, 2022 WL 1459378, at *16 (N.D. Ohio Feb. 8, 2022) (noting that an ALJ "is not required to rel[a]y or articulate their consideration of the treatment relationship" and need only articulate supportability and consistency).

In sum, Ms. Sittinger does not establish any error in the ALJ's persuasiveness analysis of Nurse Ice's opinion. Accordingly, I recommend that the Court reject this assignment of error because it lacks merit.

## VI.   RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court affirm the Commissioner's final decision.

Dated: September 7, 2023                           s/ *Jennifer Dowdell Armstrong*
                                                   Jennifer Dowdell Armstrong
                                                   U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates

37

Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d 505). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).